```
              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF OHIO
                    WESTERN DIVISION
```

Matthew Onyekelu and Cornelius          :   Case No. 1:06-cv-834
Onyekelu,                               :
                                        :
    Plaintiffs,                         :
                                        :
vs.                                     :
                                        :
Mercy Health Care Partners, et          :
al.,                                    :
                                        :
    Defendants.                         :

**ORDER**

Before the Court is the motion for summary judgment filed by Mercy Health Partners of Southwest Ohio. (Doc. 38)  Mercy contends that the undisputed facts entitle Mercy to judgment on Plaintiffs' claims for race discrimination, intentional infliction of emotional distress, and slander.  Plaintiffs oppose the motion (Doc. 42) and Mercy has filed a reply.  (Doc. 44)  For the following reasons, the Court will grant Mercy's motion.

**FACTUAL BACKGROUND**

Matthew and Cornelius Onyekelu, citizens of Nigeria, attended nursing school at Northern Kentucky University.  Both of them were hired by Mercy Health Care Partners in August 2002 as Patient Care Assistants while they were attending NKU.  Both of them received a pay increase and a promotion to a pre-license nursing position when they completed school in February 2004.  Matthew requested and received a transfer to a specialized

-1-

internship program at Mercy's Mt. Airy Hospital.  Cornelius requested and received a transfer to Mercy's Western Hills Hospital for an oncology internship.

Both brothers then requested a leave of absence, ostensibly in order to study for licensing exams.  After a month-long leave, Matthew submitted a letter of resignation dated April 16, 2004, stating "I will not be returning after my personal leave, effective from today being 4/16/04.  I appreciate all the opportunities offered to me while I was here."  (M. Onyekelu Deposition Exhibit 7)  Cornelius testified that he returned from leave, but the oncology internship required him to work day shifts, which he did not want to do.  Cornelius testified that his manager terminated him from the program, writing him a letter telling him that "I was not able to follow the schedule that they put me on, and that whenever I'm ready to finish my orientation, I can come back."  (C. Onyekelu Deposition p. 20)  Mercy's records state that his last day working for Mercy was July 29, 2004.  (Doc. 37, Exhibit B)

In their depositions, Matthew and Cornelius testified that they each requested leaves of absence after a conversation with their respective supervisors.  Matthew testified that his internship program manager called him to her office one day, and said she had heard rumors that Matthew planned to leave Mercy when he passed his board exam.  He denied that was his intent,

-2-

but she ignored him, telling him that she was the manager, and she had heard him say he wanted to attend nurse anesthesia school. She also said that "she knows that I'm a Nigerian and that Nigerians have bad reputation, kind of trying to justify the rumor that she supposedly heard." The manager also told him, that if he wanted to go on to anesthesia school it would require her recommendation, and that if he left Mercy she would not give him one. She also told him that she would "make sure that no other Catholic health partner hospital ... would hire me if I left like they were talking about in the rumor." (M. Onyekelu Deposition pp. 27-28.) Matthew said this conversation was "the last straw that broke the camel's back" and he decided to take leave. (Id. p. 29) Matthew also testified that the internship program would not accommodate his desire to work in the intensive care unit, because Mercy did not permit unlicensed nurses to work in that unit. After he left Mercy and had passed his boards, Matthew took a job at St. Elizabeth's Hospital in the ICU.

Cornelius testified that, on the very same day of Matthew's conversation with his supervisor, Cornelius was confronted by his own internship manager. Cornelius said that his manager told him she had heard a rumor that he was about to leave Mercy to go to St. Elizabeth after his internship. She said that "if I eventually leave Mercy Hospital, there is no Catholic hospital that is going to rehire me. I was like, is that a threat or

something?  I didn't say it out, but that's how I left.  And then she said that she heard - she just got - she just heard that Nigerians had bad reputation, and I said this is going to extreme. ... She was going to tell me right now that all - like all inquiries and the references are going to come through her office and she would make sure that nobody ever hires me."  (C. Onyekelu Deposition pp. 24-25.)  Cornelius immediately went to find his brother, and learned of Matthew's encounter with his own manager.  Cornelius also decided to take a leave of absence in order to study for his boards.  After he left Mercy, Cornelius was also hired to work in the ICU at St. Elizabeth's.  Both Plaintiffs admitted that during the conversations they described, their supervisors were trying to get them to stay with Mercy, and not to leave their internships.

While they worked at St. Elizabeth's, Plaintiffs also sought extra work through temporary staffing agencies.  One of those agencies was Supplemental Health Care, which placed each of the Plaintiffs with various health care providers for shift work.  In November 2005, Supplemental contacted Nursefinders, the agency that placed temporary nurses with the Mercy hospitals.  According to Ella Oerther, who worked at Supplemental, someone at Nursefinders told her that it could not place Plaintiffs with Mercy.  The Nursefinders' representative told Oerther that Mercy had put Plaintiffs on "Do Not Return" status, and that they had

"bad reputations." At Plaintiffs' request, Oerther wrote a letter to them describing her phone conversation with this unidentified individual at Nursefinders. Oerther testified that these comments were made to her in response to her queries as to why Nursefinders could not place Plaintiffs at Mercy. Oerther believed that the comments were clearly a personal opinion of the individual she spoke with at Nursefinders.

Plaintiffs decided to "test" this information by applying for nursing positions directly with Mercy. During his interview, Cornelius did not ask his interviewer or anyone else at Mercy about the Nursefinders' report of his alleged "bad reputation." Mercy offered both Plaintiffs nursing positions, and both rejected the offers. They suggest that Mercy may have offered them direct-hire positions because the salary would be less than they would have received if Mercy had hired them through Nursefinders. Cornelius admitted that placement agency nurses are almost always paid more than regular nursing employees of a hospital.

At the same time they turned down Mercy's job offers (January 2006), Plaintiffs established their own nursing placement agency called Felicity.

On March 28, 2006, each Plaintiff filed a charge against Mercy Health Partners with the Ohio Civil Rights Commission. They each alleged racial/national origin discrimination and

retaliation. They then timely filed their complaint against Mercy and Nursefinders. Nursefinders has been dismissed, and the Court previously dismissed Plaintiffs' claims for libel and retaliation against Mercy. (Docs. 20, 29) Mercy now seeks summary judgment on their remaining claims.

**ANALYSIS**

1. <u>Standard of Review</u>.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) (quoting <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253 (1968)). The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. <u>Guarino v. Brookfield Township Trs.</u>, 980 F.2d 399, 404 (6th Cir. 1992); <u>InterRoyal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989), <u>cert. den.</u>, <u>Superior Roll Forming Co. v. InterRoyal Corp.</u>, 494 U.S. 1091 (1990). Rather, the burden is on the non-moving party to "present affirmative

evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, . . . , or is not significantly probative, . . . , the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that

-7-

the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citations omitted).

2.  Racial/National Origin Discrimination.

Plaintiffs admit they do not have direct evidence of racial or national origin discrimination. They are proceeding under the familiar McDonnell-Douglas rubric for assessing discrimination claims based upon indirect evidence. A prima facie case of discrimination is established when plaintiff shows: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) his position was filled by someone outside of the protected class, OR that he was treated less favorably than a similarly-situated employee outside of his class. See, e.g., Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002). To show that another employee is similarly situated, plaintiff must establish that all relevant aspects of his employment situation were substantially similar to that of the other employee. Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998).

The precise contours of a prima facie case will vary depending on the facts, and the requirements were "'never

-8-

intended to be rigid, mechanized, or ritualistic.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)). Plaintiff's prima facie burden is not onerous, but he must raise a rebuttable presumption of discrimination. Cline v. Catholic Diocese, 206 F.3d 651, 660 (6th Cir. 2002) (internal citations and quotations omitted).

Mercy does not challenge the first and third factors, that Plaintiffs are members of a protected class and were qualified. It argues that neither Plaintiff suffered an adverse employment action, and that Plaintiffs have no evidence that non-protected individuals were treated differently or better than they were.

Plaintiffs argue that Mercy "threatened" each of them in order to compel them to stay with Mercy. After they chose to leave, they argue that Mercy's refusal to hire them through Nursefinders is an adverse action. There is some tension in Plaintiffs' allegation that Mercy was discriminating against them by trying to convince them not to leave Mercy's employ. But assuming these allegations suffice to establish an adverse action, Plaintiffs have no evidence that anyone outside their protected class was treated differently. Plaintiffs acknowledge the common fact that agency temporary nurses are paid more than regular employees. They have no evidence that other non-protected agency nurses were hired by Mercy at the time that

Nursefinders told them they would not be hired.

But assuming that Plaintiffs could establish a colorable prima facie case, Mercy has articulated a legitimate, nondiscriminatory reason for the alleged adverse action: Nursefinders was simply mistaken in telling Oerther that Mercy had put Plaintiffs on "do not return" status because they had "bad reputations."  Mercy's Director of Human Resources, Teresa Daniels, submitted an affidavit and attached Mercy's employment separation forms for the Plaintiffs.  One question on that form asks if the supervisor would rehire the employee.  On both of the forms for Matthew and Cornelius, the supervisors answered "Yes."  Daniels also avers that the information on the separation forms is put into an electronic database that is used to verify eligibility for rehire.  She states that Mercy sent a letter to Cornelius when he left, which specifically invited him to return to employment with Mercy.  (This letter is not in the record, although an unsigned copy was shown to Cornelius during his deposition, and he admitted receiving it.  C. Onyekelu Deposition at pp. 40-41.)  And Plaintiffs cannot deny that Mercy **actually offered** employment to both of them shortly after the Nursefinders-Supplemental communication, belying any reasonable inference that they were in fact on "Do Not Return" status.

Plaintiffs respond to Mercy's explanation by suggesting that Mercy did not want to pay them the higher salary required for

-10-

agency nurses. And this, they suggest, must have been because of their race and national origin, as both of their supervisors told them that Nigerians have a "bad reputation."

In order to establish pretext, a plaintiff must come forward with some evidence to show that (1) the employer's reason has no factual basis; (2) the reason did not actually motivate the employer; or (3) the articulated reason is insufficient to justify the adverse action taken. Wexler v. White's Fine Furniture, 317 F.3d 564, 576 (6th Cir. 2003). As the Supreme Court held in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000), "A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false may permit the trier of fact to conclude that the employer unlawfully discriminated."

Mercy has established a factual basis for its explanation that Nursefinders' statement to Supplemental was a mistake. The Daniels affidavit reflects that both Plaintiffs were eligible for rehire, and in fact both Plaintiffs were actually rehired. Plaintiffs have come forward with no evidence to raise a reasonable inference that Mercy's explanation lacks a factual basis.

Plaintiffs do not have evidence that Mercy's actual motivation was unlawful discrimination, as to do so Plaintiffs would have to acknowledge that Mercy's proffered explanation is

factually correct but that it should not be believed.  In view of the undisputed facts regarding their rehire eligibility, they have come forward with no evidence that might to support this inference.  See, e.g., Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1083 (6th Cir. 1994) ("The jury may not reject an employer's explanation, however, unless there is sufficient basis in the evidence for doing so. To allow the jury simply to refuse to believe the employer's explanation would subtly, but inarguably, shift the burden of persuasion from the plaintiff to the defendant, which we must not permit.")

In order to establish pretext under the third Wexler prong, Plaintiffs must have some evidence tending to show that similarly-situated applicants were treated differently.  In analyzing pretext evidence, the relevant aspects of the two applicants' situations must be similar.  See Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). But Plaintiffs have **no** evidence of anyone else who was hired through a temporary placement agency and who may have been similarly-situated to them.  They argue that because Supplemental had other nurses, some of whom were not in their protected class, that Mercy "must have" hired non-protected nurses.  This unsupported speculation is insufficient to satisfy Plaintiffs' burden of coming forward with pretext evidence.

Therefore, the Court finds that Plaintiffs have not

established a genuine dispute of material fact on their claims of alleged racial or national origin discrimination. Mercy is entitled to summary judgment on these claims.

3. <u>Intentional Infliction of Emotional Distress</u>.

Plaintiffs also claim they suffered severe emotional distress as a result of the statements made by their respective supervisors, and the same phrase - that they have "bad reputations" - being repeated by Nursefinders a year later. They admit that neither of them sought any professional assistance to deal with their distress, and that they spoke to their priest about the situation on one occasion.

In Ohio, intentional infliction of emotional distress requires pleading and proof of outrageous conduct that is atrocious and utterly intolerable. See, e.g., <u>Springer v. Fitton Center</u>, 2005 Ohio 3624 (Ohio App. 12th Dist. 2005), discussing and applying <u>Yeager v. Local Union 20</u>, 6 Ohio St.3d 369 (Ohio 1983) where the cause of action was first recognized. <u>Yeager</u> adopted language from the Restatement in describing the contours of the tort:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go

-13-

>     beyond all possible bounds of decency, and to
>     be regarded as atrocious, and utterly
>     intolerable in a civilized community.
>     Generally, the case is one in which the
>     recitation of the facts to an average member
>     of the community would arouse his resentment
>     against the actor, and lead him to exclaim,
>     'outrageous!'

<u>Id.</u> at 374-375.

The facts recited by Plaintiffs simply do not lead an average member of our community to exclaim "outrageous." See, e.g., <u>Northern v. Medical Mutual of Ohio</u>, 2006 Ohio 1075, at ¶12 (8th Dist, March 9, 2006), affirming summary judgment to employer in employee's lawsuit alleging her termination caused her intentional emotional distress: "Northern alleges she was written up using false information, was lied to, treated with contempt, disrespected and humiliated. Northern further alleges that the defendants acted with malice. However, as explained in *Yeager*, 'liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' or even where '[a defendant's] conduct has been characterized by 'malice.'"

The same result applies here. Plaintiffs have not alleged facts that could support a claim under Ohio law for intentional infliction of emotional distress.

4. <u>Slander.</u>

Plaintiffs do not oppose Mercy's motion for judgment on their slander claims, as these claims are premised upon the

-14-

November 2005 conversation between Nursefinders and Supplemental. The complaint was filed more than one year after the alleged slanderous statements, and the claims are clearly time-barred.

## CONCLUSION

For all the foregoing reasons, the Court grants summary judgment to Mercy Health Partners on all of Plaintiffs' claims. The amended complaint is dismissed with prejudice.

**THIS CASE IS CLOSED.**

**SO ORDERED.**

DATED: October 9, 2008         s/Sandra S. Beckwith
                               Sandra S. Beckwith, Chief Judge
                               United States District Court